UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
            -v.-                                     :        04 Cr. 473 (GEL)
                                                    :
LUIS MELENEDEZ,                                     :        **OPINION AND ORDER**
                                                    :
                        Defendant.                  :
                                                    :
-------------------------------------------------------------x

David N. Kelley, United States Attorney for the
Southern District of New York (John J. O'Donnell,
Assistant United States Attorney, of counsel), for the
Government.

Alexander E. Eisemann, Esq., New York, NY, for
defendant Luis Melendez.

GERARD E. LYNCH, District Judge:

On December 23, 2004, Luis Melendez was found guilty by a jury, after a three-day trial,

of possession of crack cocaine with intent to distribute, possession of a firearm in furtherance of

a drug crime, and possession of a firearm after conviction on a felony offense. On December 28,

Melendez timely moved, pro se, for a new trial and for the appointment of new counsel. After

new counsel was appointed, the Court granted successor counsel an extension of time to file

briefs in support of the motion, and on April 15, 2005, counsel filed papers seeking a new trial

and other relief. The Government responded on August 1, 2005. For the following reasons, the

motion will be denied.

## BACKGROUND

The evidence at trial can be summarized as follows. On April 13, 2004, after Melendez

was detained on an alleged violation of parole, three New York City police officers who were

investigating his activities visited 1263 Commonwealth Avenue, which Melendez's parole officer had told them was his address. Upon arrival at the address, the officers met Melendez's girlfriend, Tusheeka Price, and their three-year-old son. Price consented both orally and in writing to a search of the apartment, and when asked if Melendez stayed at the apartment and where he kept his clothes, Price showed the officers to a hall closet.

The closet did indeed contain men's clothes. It also contained a small box that contained thirteen bullets, a receipt with Melendez's name on it, and a number of small plastic baggies. In a different closet, officers found a safe on the floor. The officers identified the odor of marijuana emanating from vents in the safe. Later, at the precinct, a narcotics-detecting dog reacted positively to the safe. Based on this evidence, on April 15, the officers and a federal agent obtained a federal search warrant to open the safe. When it was opened the next day, inside was found, among other things, 35 grams of crack cocaine, a loaded 9mm handgun, a loaded .38 caliber handgun, over 50 rounds of 9mm ammunition of various makes, razor blades, a scale and baggies, and a set of car keys. The car keys were found to operate a green Ford Expedition that belonged to Melendez.

In addition to the law enforcement witnesses who testified to these facts, the Government called Price, who testified under immunity. Price testified that Melendez was the father of her son, and that he visited her and her son and kept clothes at her apartment. She denied consenting to a search of her apartment, however, and testified that the safe belonged not to Melendez, but to a person named "Jimmy," a friend of her cousin's whom Price had met on the street and had dated, but whose last name, address, and phone number she did not know. The Government then confronted Price with testimony she had given before the Grand Jury, where she had testified

that the safe belonged to Melendez, who had brought it to her house in January 2004.

There was also testimony about two additional prior inconsistent statements by Price. An NYPD detective testified that Price had told officers during the apartment search on April 13 that Melendez owned the safe, and signed a written statement to that effect. An investigator with the United States Attorney's Office testified that Price had confirmed outside the grand jury room that the safe belonged to Melendez; the investigator also denied that Price had been threatened or intimidated.[1]

Melendez's counsel elicited various items of evidence in an effort to discredit the Government's case. The defense theory was that the keys to Melendez's car were not in the safe, where they could connect Melendez to the guns and drugs found there, but had been Price's set of keys, kept on a hook on a closet door. Price indeed testified, in response to defense questioning, that she kept a set of keys to Melendez's car on such a hook, and that the keys went missing after the search of the apartment. The police officers admitted that they had not listed the car keys on the voucher, search warrant return, and other paperwork connected to the search of the safe.

The defense also disputed Melendez's connection to Price's residence. For instance, counsel elicited testimony from Price that *she*, not Melendez, had brought his clothing to the

---

[1] Price's credibility was also damaged by other matters. For example, Price claimed that she had never told the police that the safe belonged to Melendez, and claimed that she had signed the written statement to that effect without reading it. She admitted that after the police left, she "told Mr. Melendez that the police had recovered his safe." (Tr. 138.) She claimed not to recall any of the elaborate catechism of rights that was read to her at the outset of her grand jury testimony, including the right not to proceed at all without a lawyer, and claimed instead that she was told that she had "no choice but to" testify immediately (Tr. 127-28), though the grand jury transcript conclusively demonstrates the contrary.

apartment, moving it with her from her mother's house. She further testified that she had the clothing of three other men, including the elusive "Jimmy," in her apartment. Counsel also called a more current girlfriend of Melendez's (who described herself as Melendez's fiancee), who testified that Melendez slept with her nearly every night for the several months before his arrest in April 2004, and spoke to her on the phone from his godmother's house on the few nights they were apart.

## DISCUSSION

In support of his motion to set aside the jury's verdict, Melendez challenges several aspects of his trial, including (1) the admission of Price's grand jury testimony; (2) the sufficiency of the evidence to support the verdict; (3) the effectiveness of trial counsel; and (4) the alleged suppression of favorable evidence by the Government.

I.     <u>Timeliness</u>

At the threshold, the Court must consider whether the motion, or some portion of it, is untimely. At the time defendant's motion was filed and briefed, the Federal Rules of Criminal Procedure provided that post-trial motions for a judgment of acquittal notwithstanding a guilty verdict or for a new trial (on grounds other than newly-discovered evidence) had to be brought within seven days after the verdict, "or within any other time *the court sets during the 7-day period*." Fed. R. Crim. P. 29(c)(1) (2005) (emphasis added); <u>see</u> <u>also</u> Rule 33(b)(2) (substantially the same). That the rules meant what they said was further emphasized by Rule 45(b)(2), which provided that despite the trial court's general power to extend time limits, "the court may not extend the time to take any action under Rules 29 [and] 33 . . . except as stated in those rules."

4

Despite some loose talk in earlier appellate opinions, it is now settled that these time limits were not jurisdictional.  Eberhart v. United States, 126 S.Ct. 403, 404-05 (2005) (per curiam).  Thus, for example, the untimeliness objection could be forfeited if not raised by the Government in a timely manner.  See United States v. Robinson, 430 F.3d 537, 541-42 (2d Cir. 2005).  However, though not jurisdictional, the time limits were "inflexible," and were to be strictly applied if a party properly raised them.  Eberhart, 126 S.Ct. at 407.

While the strict time limits on post-trial motions served the commendable purposes of preventing undue delay, the rules worked a somewhat irrational hardship in some unusual circumstances.  For example, as illustrated in Robinson, if, as a result of extreme weather conditions or illness, an attorney was unable to file a motion on the last day of a properly-extended period to file post-trial motions, the routine remedy of granting a modest extension would be precluded, and the motions could not be filed.  Of course, as the Court of Appeals emphasized in United States v. Canova, the defendant would not be left without remedy:  He could still file a direct appeal or seek to vacate his conviction pursuant to 28 U.S.C. § 2255.  412 F.3d 331, 345 n.15.  But these remedies are more cumbersome, and impose additional burdens on the courts and on defendants.

These burdens were rendered further arbitrary by the fact that however strict the time limits were in theory, they could easily be evaded.  As the Canova court noted, while a court was without power to grant a second extension of the time to file post-trial motions, an alert defense counsel could avoid the rule by making an immediate oral motion, as soon as the jury's verdict was recorded, for a new trial and a judgment of acquittal, and asking the court to set an extended time period, not for *making* the motion, but for *briefing* it.  The defendant could then seek and

receive further extensions of the briefing period as needed, since the motion was long since timely made. Id. at 347. This elevation of form over substance rendered the rule utterly without effect, except as to defendants whose lawyers were unaware of the trick.

As a result of such considerations, the Federal Rules were amended, effective December 1, 2005, to eliminate the former restriction on the power to grant successive extensions of the time limits. Thus, the present language of Rules 29(c)(1) and 33(b)(2) simply provides for a seven-day time limit for the filing or renewing of a motion, omitting the language concerning extensions, and Rule 45 no longer exempts these time limits from the court's general power to extend time limits on a motion made "before the originally prescribed or previously extended time expires." Rule 45(b)(1)(A).

Application of the former rules to the present case presents additional complexities. As noted, Melendez made a pro se motion for a new trial within the 7-day time limit set by Rule 33. At that time, he was still represented by trial counsel; however, he made clear in the motion that he was dissatisfied with that attorney's performance, and sought appointment of a new lawyer. That appointment was not granted until January 14, 2005, some two weeks after the 7-day time limit had expired. New counsel needed additional time to consider whether to pursue the motion filed by Melendez or to develop alternative grounds for relief. Accordingly, the Court granted new counsel 60 days to decide whether to withdraw defendant's pro se motion and/or file additional motions.

Moreover, Melendez's pro se motion contained assertions that a cautious advocate might consider ill-advised, leading counsel, when the Court questioned whether counsel intended to pursue the issues raised by Melendez pro se, to seek to withdraw the pro se motion in favor of a

fuller or different motion to be made later. Thus, in an order issued on February 24, 2005, in response to that request and to a request for a further extension of time for counsel to file additional motions, the Court deemed defendant's pro se motion withdrawn, but pointed out that the previously-set deadline for the filing of motions was March 15, 2005, and that there was some doubt as to the Court's power to grant a further extension.[2]

By letter dated March 14, 2005, counsel for Melendez advised the Court that his investigation had unearthed a number of grounds for further motions, and was continuing. He therefore sought still more time to brief the motion already filed, and to make additional motions. Finding that it was "unquestionabl[y] in the interest of justice to grant defendant's request for additional time," and noting (1) that at least some of the issues counsel sought to raise had been timely presented to the Court in the pro se motion, (2) that there was even then authority that the Court could grant an extension of time for *briefing* a Rule 33 motion that was timely made,[3] and (3) that the law was uncertain as to the Court's power to extend the deadline for filing new motions, the Court entered an Order on March 15 that vacated the prior order deeming the pro se motion withdrawn, extended the time for briefing that motion until April 15, 2005, authorized Melendez to file new motions until that date "to the extent the Court has power to grant such an extension," and invited the parties to brief the timeliness issues, including whether a brief that

---

[2] The doubt existed because some courts had prefigured the strict interpretation of Rules 29, 33, and 45 later adopted by the Second Circuit, see, e.g., United States v. Hocking, 841 F.2d 735, 736-37 (7th Cir. 1988), while others had interpreted the rules to have more flexibility than their terms themselves suggested. See, e.g., United States v. Reinhold, 20 F. Supp. 2d 541, 547-48 (S.D.N.Y. 1998); United States v. Robinson, 303 F. Supp. 2d 231, 234-36 (N.D.N.Y. 2004), aff'd, 430 F.3d 537 (2d Cir. 2005).

[3] See, e.g., United States v. Eberhart, 388 F.3d 1043, 1050 (7th Cir. 2004), rev'd, 126 S.Ct. 403 (2005) (per curiam); United States v. Newman, 456 F.2d 668, 669-70 (3d Cir. 1972).

raised issues not asserted in Melendez's pro se motion in effect constituted a new motion or simply further briefing of the old.

The Government now advances the timeliness issue in opposition to Melendez's motion, thus posing the following issues: (1) Is the question of timeliness governed by the law applicable at the time the extensions were sought, under which the Court was not permitted to grant an out-of-time extension, or by the law applicable today, under which a court can grant such extensions freely? (2) Even under the former law, did the Government do anything that could be construed as waiver or forfeiture of the issue? (3) Assuming that the issue is to be decided under the former law, and that the Government preserved the timeliness objection, did the withdrawal of the pro se motion terminate Melendez's right to seek further extensions of the briefing period, and if so, did the Court's later vacation of the order withdrawing the motion restore that right nunc pro tunc? (4) Assuming the answer to the previous question is yes, and that, as suggested by the Second Circuit in <u>Canova</u>, an oral motion on unspecified grounds would have preserved the ability to grant repeated extensions to raise any issues at all, would the fact that the pro se motion was based on specified issues prevent defendant from taking advantage of the "extended briefing" loophole to raise entirely new issues not suggested by the original motion?

Since the cases that clarify the meaning of the former time limit rules (<u>Eberhart</u>, <u>Canova</u>, and <u>Robinson</u>) were not decided until after the parties briefed the present motion – and indeed, until the very eve of the obsolescence of the rules they interpret – the parties understandably have not addressed these issues in any detail.

8

However, the Court need not unravel the nuances of these former time limits, which have gone to a deserved resting place in the dustbin of history. It is now established that, even if strictly applicable, the time limits did not deprive this Court of jurisdiction to grant out-of-time extensions. Thus, since the issue is not jurisdictional, the Court may first consider the merits of Melendez's objections, and then rule on the timeliness issue if necessary. As the Court ultimately concludes that the arguments in Melendez's motion are substantively without merit, it need not address the complex questions presented by the Government's timeliness objection.

II.   Admission of Price's Grand Jury Testimony

A new trial may be granted where the admission of evidence was erroneous, unless its admission was "unimportant in relation to everything else the jury considered on the issue in question," that is, harmless. United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998) (quotation marks omitted). Melendez claims that the Court made such an evidentiary error by admitting Price's grand jury testimony as substantive evidence.

It is undisputed that the Government was permitted to impeach Price's testimony by confronting her with her prior inconsistent statements. Fed. R. Evid. 607 (witness's credibility "may be attacked by any party, including the party calling the witness"). Melendez argues, however, that it was error, under the Federal Rules of Evidence, the Due Process Clause of the Fifth Amendment, and the Confrontation Clause of the Sixth Amendment, as interpreted in Crawford v. Washington, 541 U.S. 36 (2004), to admit Price's grand jury testimony as substantive evidence. This argument is meritless.

First, the admission of the testimony as substantive evidence is expressly permitted by Rule 801(d)(1)(A), which excludes from the definition of hearsay (and thereby renders

admissible) an out-of-court statement made by a witness who "testifies at the trial or hearing and is subject to cross-examination concerning the statement," where the statement is "inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding."

All of the conditions set by the Rule were clearly met by Price's grand jury testimony. Price testified at trial, and was subject to cross-examination about the statement if the defense had chosen to inquire. The grand jury testimony, in which Price stated that the safe belonged to Melendez, was flatly inconsistent with her trial testimony, in which she attributed ownership of the safe to the mysterious "Jimmy." The prior testimony before the Grand Jury was, of course, given under oath, as Price admitted at trial. Melendez does not dispute that a grand jury inquiry is a "proceeding" within the meaning of the rule. See United States v. Marchand, 564 F.2d 983, 998-99 (2d Cir. 1977) (Friendly, J.) (admitting prior grand jury testimony under Rule 801(d)(1)(A)); 5 Weinstein's Federal Evidence ¶ 801.21 (2d ed. 2004) (rule applies to grand jury testimony).

Second, the Supreme Court's decision in Crawford does not affect this conclusion. Crawford held the Confrontation Clause of the Sixth Amendment prohibits the introduction of "testimonial" hearsay without the opportunity to confront the declarant, unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination, regardless of whether the hearsay statement falls within a traditional hearsay exception or is otherwise held to be "reliable." 541 U.S. at 68. Whatever the precise parameters of Crawford, it can have no application here. Melendez had every opportunity to confront Price, who appeared at trial, testified under oath, and was available for and subject to cross-examination. Indeed, Price not

only was available to qualify or contradict her grand jury testimony, she actually offered testimony at trial inconsistent with her grand jury testimony. Thus, there was no conceivable violation of Melendez's confrontation rights.

Third, there was no violation of due process. It is unclear precisely what about the testimony Melendez claims violates his right to due process; in any case, there is no reason to think that the Due Process Clause of the Fifth Amendment provides more ample protection against the admissibility of out-of-court statements than the more specific guarantee of confrontation of witnesses contained in the Sixth.

Nor can Melendez support a claim of violation of the rules of evidence or of due process by shifting his challenge from the fact of the admission of the testimony to the timing or manner of its admission. Melendez argues that his rights were somehow violated when the Court first gave, and then retracted, a limiting instruction to which he was not entitled. The trial record belies his claim that he was somehow prejudiced by these events.

While Price was testifying on direct examination, after Price had testified that the safe belonged to "Jimmy" rather than to Melendez, the prosecutor properly impeached her with her prior testimony. (Tr. 126-33.) At the conclusion of this process, the prosecutor offered the grand jury transcript into evidence "pursuant to Rule 801(d)(2)."[4] On the express disclaimer of objection by defense counsel, the evidence was received without limitation.

After Price's testimony, which included direct, cross, re-direct, and re-cross examination, was concluded, the Government called Detective Denise Strype, who testified about the police

---

[4] The citation of the rule number was apparently a slip of the tongue for "801(d)(1)." The adjacent Rule 801(d)(2) relates to admissions by parties-opponent, and has nothing to do with the present issue.

visit to Price's home, including Price's written and oral statements to the police on that day that the safe belonged to Melendez. (Tr. 195.) At the conclusion of Strype's direct examination, the Court gave a limiting instruction, contrasting the testimony Price gave at trial under oath and in person with "other things that Ms. Price is alleged to have said at other times" that the jury had heard through the testimony of Strype "and also on cross-examination of Ms. Price." (Tr. 196.)[5] The Court advised the jury that Price's trial testimony was direct evidence on the subject of guilt or innocence, but that a prior inconsistent statement such as the statement to the officers (which had been the subject both of testimony by Strype and of the impeachment of Price) was admitted only "for whatever light it casts on whether you should believe what [Price] said in court." (Tr. 196-97.) The limiting instruction did not explicitly mention Price's grand jury testimony. However, to the extent that the Court, no doubt focused on the testimony of Strype that had just been received, referred generally to prior statements by Price that had been the subject of "cross-examination," the instruction could be taken as applying to the grand jury testimony as well as to the statement to police. Presumably to raise that point, the prosecutor asked to approach the bench; the Court declined the request, and cross-examination of Strype proceeded.

At the next recess in the trial, after Strype's cross-examination and the testimony of two other brief witnesses, the Court turned to a number of open evidentiary issues. In the course of the conference, the Court sua sponte revisited the earlier limiting instruction, having in the interim realized that the instruction as given was overbroad, because the grand jury testimony, unlike the unsworn prior inconsistent statements the jury had heard, was admissible without

---

[5] The reference to "cross-examination" clearly referred to the impeachment of Price by the prosecutor, which in fact had occurred on her direct examination.

limitation. Referring to the prosecutor's earlier effort to approach, the Court said, "Now, Mr. Burns, you were going to tell me that I was wrong about the grand jury testimony because the grand jury testimony [was] under oath and, therefore, isn't hearsay under [Rule] 801(d)(1)(A)." (Tr. 211.) The Court then explained the rule, and noted that the grand jury testimony "had sort of slipped my mind in giving the general instructions about prior statements," because the parties had earlier discussed a limiting instruction in the context of "the statements given in the apartment," and "at the time I gave the jury that instruction I wasn't focused on the grand jury [testimony]." (Tr. 212.) Defense counsel acknowledged that the Court was correct, and the Court concluded, "Then I'll correct that when the jury comes back." (Id.) The Court did, explaining to the jury on its return that the grand jury testimony, unlike the other alleged prior inconsistent statements could be considered for its truth "as substantive evidence." (Tr. 215-16.)

Contrary to Melendez's assertions, this sequence of events can in no way have misled defense counsel about the basis of the admission of the grand jury testimony, or caused defense counsel to have foregone any cross-examination of Price that would otherwise have occurred. No limiting instruction was given while Price was on the stand. Rather, the grand jury testimony was received without limitation when offered by the Government, without objection or a request for a limiting instruction from defense counsel. (Tr. 133.) The limiting instruction, which did not expressly refer to the grand jury instruction but could have been taken as applying to it, was not given until after Price was off the stand and the direct examination of the next witness, Strype, had concluded. (Tr. 196-97.) The immediate stimulus and focus of the instruction was clearly the statement in the apartment to which Strype had just testified. The correction was made at the next recess, in essence only a few transcript pages later. (Tr. 211-12.) Thus, to the

extent counsel might have been confused about the ruling, such confusion could have lasted at most only a few minutes, after Price had left the witness stand, and could not have affected any decisions by counsel about whether and how to question Price.

Apparently recognizing the impossibility of this argument, Melendez invents out of whole cloth an off-the-record ruling that the grand jury testimony was only admissible for impeachment, which upset the prosecutor and was the basis of the prosecutor's attempt to approach the bench. (Melendez Decl. ¶ 2.) This is either a conscious fabrication or, more charitably, a mis-recollection of the events just described. First, this Court does not conduct off-the-record proceedings, and did not do so here. Second, contrary to Melendez's claim, the prosecutor's request to approach the bench before Strype's testimony, and the Court's refusal of that request and announcement that "the ruling I made before stands" (Tr. 188) related not to any purported ruling about the grand jury testimony, but to another matter entirely. That matter requires brief elucidation, both to clarify the Court's reference to a "prior ruling" and because it explains defense counsel's tactical reluctance to elicit on cross-examination any testimony from Price that her grand jury testimony or her statement to Strype had been coerced.

At a pre-trial conference on December 10, 2004, the Government had sought an in limine ruling about the admissibility of anticipated testimony by Strype about an incident that had occurred during the search. The Government planned to offer testimony that Price had initially denied the safe belonged to Melendez, but that during that discussion, Melendez's three year old son had entered the room and confronted the officers, stating that the safe was "Daddy's safe," and that "Daddy puts his stuff in it," at which point Price changed her story and told the officers that the safe was indeed Melendez's. (Gov't First Mot. In Limine 2-3.) The Court ruled, over

14

the Government's objection, that this statement would not be admitted, because it was hearsay, and hearsay from a toddler whose competence to testify in person was doubtful and untested. (12/10/04 Tr. at 3-4.) However, though the statement would not be admitted for its truth under any circumstances, the Court ruled that if Price were to testify that she had changed her story about the safe for some reason other than the child's intervention, the fact that the statement had been made would likely become admissible (subject of course to an appropriate limiting instruction) to permit the Government to give its explanation of the otherwise-inexplicable change of story. (Gov't Br. at 9, citing 12/20/04 Tr. at 4-6, 7-11, 24-26.)

In the context of these events, the Court understood the prosecutor's request for a sidebar before Strype's testimony as an effort to revisit this ruling, either by way of general reargument or by relying on a passing comment by Price that she was told to sign a paper "and nothing was going to happen to my son." (Tr. 137.) Concluding that the comment was harmless and that the defense had not opened the door to the admission of the child's statement, the Court rebuffed the Government's request and adhered to its prior ruling. (Tr. 188.) Thus, nothing in the colloquy supports Melendez's fanciful claim that his attorney had been confused by a non-existent off-the-record ruling by the Court.

In short, Melendez's attack on the admission of Price's grand jury testimony is entirely without merit.

III. Challenges to the Sufficiency of the Evidence

Melendez next challenges the sufficiency of the evidence to support his convictions for possession of any items found in Price's home, and therefore seeks a judgment of acquittal on all three counts.

A.     Sufficiency of the Evidence of Possession

Melendez first argues that, if Price's grand jury testimony is stricken, as he claims it should be, the remaining evidence is insufficient to establish his possession of the guns and drugs found in the safe.  This claim is completely lacking in merit, for three reasons.

First, as discussed above, the condition for the argument is incorrect:  Price's grand jury testimony was properly admitted under Rule 801(d)(1)(A).

Second, the legal premise of the argument is wrong:  A defendant is not entitled to a judgment of acquittal "where the evidence offered by the [prosecution] – whether erroneously or not – would have been sufficient to sustain a guilty verdict."  Lockhart v. Nelson, 488 U.S. 33, 34 (1988).  Put another way, "where some government evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence."  United States v. Cruz, 363 F.3d 187, 197 (2d Cir. 2004).

Third, the factual premise of the argument is also wrong:  Even without Price's grand jury testimony, the evidence would permit a reasonable jury to conclude beyond a reasonable doubt that the guns and drugs in the safe belonged to Melendez, because they were found in the safe with the keys to his vehicle, in the apartment of the mother of his child at which the jury could find he was a regular visitor.

B.     Sufficiency of the Evidence of Furtherance of a Narcotics Crime

Melendez next makes a more specific challenge to the sufficiency of the evidence that he possessed a firearm in furtherance of a narcotics crime.  This argument also fails.

Section 924(c) makes it a crime to possess a firearm "in furtherance of" of drug trafficking crime.  The "in furtherance" element is satisfied by proof of "some nexus between the

firearm and the drug selling operation," United States v. Finley, 245 F.3d 199. 203 (2d Cir. 2001), that is, "that the gun afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking," United States v. Lewter, 402 F.3d 319, 322 (2d Cir. 2005). This is "clearly a very fact-intensive question requiring a careful examination of, among other things, where the gun was located and what else was found in the apartment." United States v. Taylor, 18 F.3d 55, 58 (2d Cir. 1994). It is thus particularly suited to resolution by a jury.

Here, Melendez was found guilty of possessing narcotics with intent to distribute. The narcotics in question were found, along with the various implements of the narcotics trade (razor blades, baggies, a scale) in the same safe as the guns and ammunition. As the First Circuit has noted, in a case cited with approval by the Second Circuit in Lewter, 402 F.3d at 322, "[w]hen guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun, whether kept for protection from robbery of drug-sale proceeds, or to enforce payment for drugs, may reasonably be considered to be possessed 'in furtherance of' an on-going drug-trafficking crime." United States v. Garner, 338 F.3d 78, 80-81 (1st Cir. 2003).

Melendez attempts to distinguish Lewter by arguing that there, the gun was within easy reach of the defendant, under the bed on which he was sitting when arrested. 402 F.3d at 321. This is unavailing. Section 924(c) does not apply only to defendants who are arrested in the room where they keep their drugs and guns. Here, the guns, loaded and accompanied by additional ammunition, were kept not on Melendez's person, as he went about his daily, non-drug-related activities, but with his drugs and drug paraphernalia, available for use when the drugs were being distributed. A reasonable jury could certainly draw the logical inference that

the gun was there to be taken out and utilized in connection with the drug operation with whose

other implements it was stored.[6]

For these reasons, the jury's verdict was supported by ample evidence.

IV.    Ineffectiveness of Counsel

Melendez also seeks a new trial on the ground that his trial attorney failed to render

effective assistance, by (1) failing to argue to the jury that the gun possession was not proved to

be in furtherance of a narcotics crime; (2) failing to recall Price for further cross-examination;

(3) failing to develop various pieces of evidence that Melendez claims would have been

favorable to his cause; and (4) recklessly opening the door to damaging evidence.

To succeed on a claim of ineffective assistance of counsel, a defendant must establish

that his attorney's representation fell below "an objective standard of reasonableness," and that

this lapse of professional representation caused prejudice in the sense that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 693-94 (1984).  "In applying

this standard, a reviewing court must make 'every effort . . . to eliminate the distorting effects of

hindsight' and 'indulge a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance.'"  United States v. Cohen, 427 F.3d 164, 168 (2d Cir.

2005), quoting Strickland, 466 U.S. at 689.  Further, decisions concerning matters primarily of

---

[6] Contrary to Melendez's argument, the fact that the Government on summation noted that the guns were in a safe to keep them away from Melendez's young son casts no doubt on this analysis.  The Government pointed out, logically enough, that the guns *and drugs* may have been kept in a safe for reasons of safety and security.  (Tr. 329.)  That the guns and drugs may have been kept in a particular place for those reasons is in no way inconsistent with the conclusion that the guns were possessed in order to further Melendez's drug-trafficking activities.

"trial strategy and tactics," such as decisions to offer or to stipulate to certain evidence, or decisions about when and how to object, "are 'virtually unchallengeable' absent exceptional grounds for doing so." Cohen, 427 F.3d at 171.

A.     Failure to Argue Lack of Furtherance

Melendez argues that his trial attorney was deficient in failing to argue to the jury that the Government had failed to prove that the possession of the firearm was in furtherance of a narcotics crime. This decision was a pure tactical judgment that would no doubt be made differently by some attorneys, but the strategy adopted was a reasonable one that was well within the limits of professional representation.

Melendez's trial counsel vigorously argued on summation that the guns and drugs found in the safe were not his, and that he should therefore be acquitted on all counts. This was a reasonable strategy, as the Government's proof was hardly overwhelming. The evidence was primarily circumstantial. The incriminating evidence was found in an apartment in which Melendez did not live and arguably had never lived, although he had apparently used the address and had intimate family ties to the occupants. The defense presented a witness who disputed whether Melendez was a regular visitor there. The only eyewitness who could tie Melendez to the safe and its contents, Price, disavowed her earlier testimony that the items belonged to him, and testified to the contrary in front of the jury. Melendez's fingerprints were not found on the safe or on anything in it, and no other forensic evidence connected him to the guns or drugs. The presence of the car keys in the safe was damning, but the defense developed significant evidence and ingenious arguments casting doubt on whether they were actually found where the police witnesses said they were found. The defense strategy of seeking a total acquittal was therefore a

reasonable one.

Melendez now argues that counsel should have presented a fallback position that, assuming the guns and drugs *did* belong to him, and that he was therefore guilty of possession of crack with intent to distribute and possession of a firearm by a convicted felon, the Government had failed to prove that the guns were possessed in furtherance of the narcotics offenses. He points out that, analytically, there is a benefit and no downside to the argument: Because defendant may argue in the alternative, it would not be necessary to concede guilt to present a fallback position, and there would be a significant benefit to Melendez in being acquitted of the charge under section 924(c), which carries a mandatory consecutive prison sentence, even if he were convicted on the other counts.

The argument that the fallback position could have been presented with a chance of victory and no downside, however, has the smell of the lamp about it. In the abstract, from an academic, theoretical perspective, Melendez is correct that a fallback argument or argument in the alternative does not require a concession, and could be presented, lawfully and without logical contradiction, while simultaneously pressing an argument for complete acquittal. But every trial lawyer knows that such fallback arguments carry substantial risks. Jurors may be suspicious of a defendant who argues that he never borrowed the pot, but that if he did it was broken when he got it; worse still, some jurors may simply write off the argument for complete acquittal, and mishear or misunderstand the argument as effectively conceding possession.

This does not mean, of course, that making the fallback argument would have been an unprofessional strategy. Different lawyers differently evaluate the advantages and disadvantages of making such alternative or fallback arguments, and their differences are reasonable.

Moreover, the assessment of risk and benefit depends on subtle gradations of difference in the likelihood of success on the respective arguments: If the argument for total acquittal is a forlorn hope, but the evidence on the additional count is marginal, the balance of risks and benefits is more likely to favor making the argument; if there is a real chance of convincing the jury to acquit outright on the basis of a reasonable doubt about whether the guns and drugs belonged to defendant at all, but the defense argument on the "in furtherance" element is weak, the risk of undermining one's credibility by advancing the fallback argument takes on greater weight.

Here, counsel's choice was reasonable. As noted above, the argument for outright acquittal was a reasonable one. If the jury concluded, however, that both guns and drugs belonged to Melendez, there was little possibility that it would not find the requisite nexus between them. Lawyers and judges can plausibly quibble over how much evidence is needed to justify a conviction on a section 924(c) charge, but the common sense of jurors is unlikely to linger long over whether a pair of guns found in a safe with a quantity of crack and narcotics paraphernalia were possessed in furtherance of the drug crime, particularly in a case in which there was no evidence whatsoever of any other, non-drug-related, rationale for possession of the weapons.

Thus, counsel's failure to argue that Melendez may have possessed the guns and drugs, but that the gun possession was not in furtherance of the drug crime, was a reasonable exercise of professional judgment.

B.  Failure to Recall Price for Further Cross-Examination

Melendez argues that counsel should have recalled Price for further cross-examination with respect to her first change of story (that is, the switch from her initial statement that the safe

did not belong to Melendez, followed by her written statement and grand jury testimony to the contrary, as distinguished from her second change of story, the switch from her inculpatory statements to her exculpatory trial testimony). This claim is dependent on Melendez's erroneous contention, rejected above, that the Court somehow "broaden[ed] the scope of admission of Ms. Price's grand-jury testimony after she had left the stand." (D. Br. 14.) As explained above, no such "broadening" occurred.

In any event, Melendez does not address the compelling prejudice that might have occurred if Price had attempted to explain away the change of story from her initial contention that Melendez did not own the safe to testimony that he did. This transition, as explained above, occurred not at the Grand Jury but in her apartment, where she made a written statement consistent with her grand jury testimony. Since the Government may then have attempted (and very well may have been permitted) to offer *its* version of how that change of heart came about, which was predicated on the damning statement of Melendez's young son, there was a reasonable tactical explanation for the failure to cross-examine further.

C.    Failure to Develop Evidence

Melendez next contends that counsel was ineffective for failing to offer a number of bits of evidence. This list of complaints constitutes at best second-guessing of reasonable judgments made by trial counsel, and at worst very poor guesses indeed.

(1) Melendez argues that counsel failed by not eliciting from Price that "she never allowed [Melendez] into her house" because she did not want him to discover that she had a new boyfriend. (D. Br. 14.) But Melendez's speculations about what Price *would have said* if a question seeking this response had been asked (Melendez Decl. ¶ 4), are contradicted by what

Price *did say* when asked about this subject at trial.  On direct examination by the Government, she said that Melendez "[s]ometimes" came to visit her and their son at her apartment, but that during the period in question she saw Melendez "[n]ot a lot."  (Tr. 124.)  Moreover, defense counsel did elicit testimony on cross-examination minimizing the extent of Melendez's presence at the apartment.  (Tr. 148-49.)  This testimony was more than adequate to support the defense argument that Melendez did not maintain a regular presence in Price's home, which was further supported by the defense witness Alicia Lawrence, Price's successor in Melendez's affections.  The testimony, however, was inconsistent with what Melendez now claims Price would have said; in fact, Price testified on cross as well as on direct that Melendez came to the house as much as weekly, and that on those occasions would either leave with his son or "[s]tay for a little while and then leave."  (Tr. 149.)[7]

(2) Melendez next argues that defense counsel unjustifiably failed to elicit Price's story that she had been browbeaten by Government agents into providing the written statement and grand jury testimony incriminating Melendez.  (D. Br. 15.)  As already discussed, this course of action posed significant risks for the defense, because it would have opened the door to the potentially damning statement made by Melendez's son.  Melendez's only response to this problem is to suggest that Price would have provided an alternative explanation of the child's statement.  (Id.)  Perhaps taking on those risks would have been a reasonable choice, but it was certainly a more than reasonable judgment by trial counsel that the risk of a vivid incriminating

---

[7] To the extent that Melendez argues that the defense should have emphasized that Price wanted to get back together with him, and that this desire provided a motive for her to keep him out of the house so he would not learn of her other boyfriends, the argument only emphasizes the reasonableness of competing approaches to evidence that cuts both ways.  In fact, at the trial, it was the *Government* that sought to show Price's continuing affection for Melendez, as a way of impeaching her favorable trial testimony.  (Tr. 124, 138, 328, 333-34.)

statement that might have been mistaken by the jury as substantive evidence of guilt (in spite of the anticipated limiting instruction to the contrary), outweighed the dubious benefits of pitting Price against several different police officers and federal investigators in a credibility contest.

(3) Melendez claims that counsel should have called Price's landlord to confirm that other men did indeed visit Price and that Melendez did not stay there. (D. Br. 16.) But a reasonable lawyer could well have anticipated (correctly, as it turned out) that the Government would not dispute that Price had other boyfriends, and that further verification of that point would not make a difference in the jury's view of whether Melendez kept his guns and drugs in the safe at her house.[8]

(4) Melendez argues that counsel should have argued that the Government's contention that receipts relating to his automobile were found in three separate places was absurd on its face (D. Br. 16-17), and should have elicited from defense witness Delgado (Melendez's uncle) that some such receipts were in the car when he recovered it (id. 17). These claims are ridiculous and contradictory. First, it is hardly self-evident that all, most, or even many people keep all their automobile-related receipts in one place. Second, the putative testimony from Delgado would not have supported this theory, but contradicted it, by indicating that some such receipts were in the car, which was obviously *not* the source of the receipts collected by the police. Third, the defense relied instead on an ingenious if ultimately unpersuasive argument not merely that the receipts would likely have been kept in the same place, but rather that the pattern of fold lines on the various papers demonstrated that they *had been* kept in the same place, Melendez's wallet.

---

[8] Melendez suggests that the landlord observed the otherwise mysterious "Jimmy" at the house – a man the Government suggested was largely a fabrication – but in fact acknowledges that the landlord did not know the names of the men who visited Price. (D. Br. 16.)

The hindsight arguments now proposed by Melendez would have added nothing substantial to the defense case.

(5) Melendez claims that counsel erred by not introducing into evidence police reports that failed to refer to the presence of the car keys in the safe, or an extra-large men's t-shirt, which could not have fit Melendez, found in Price's apartment. (D. Br. 17-18.) This argument grasps at straws. As Melendez admits, counsel did elicit, and emphasized in summation, the fact that the paperwork connected to the search of the safe did not mention the keys, and the Government did not dispute that embarrassing omission. Similarly, Price testified without contradiction that other men's clothes were kept in her apartment, and this too was not disputed at trial.[9] Perhaps Melendez's current counsel is correct that these points could have been made more vividly with the jury's personal review of the police reports, or through having Melendez wear the oversized t-shirt in the courtroom, but the failure to engage in flamboyant demonstrations, like the failure to employ any particular mode of argumentation, does not constitute the kind of departure from professional norms required by Strickland; still less is there any likelihood that the outcome would have been affected by marginal improvement in the way evidence was presented.

(6) Finally, Melendez argues that trial counsel should have further investigated evidence that fingerprints were found on two items in the safe. (D. Br. 18-19.) The defense did bring out that no fingerprints of his were found on any of the items, and specifically raised a police report

---

[9] Melendez further states, on "information and belief," that the t-shirt was recovered from the very safe containing the guns and drugs. (Melendez Decl. ¶ 6.) Melendez's after-the-fact and unsupported assertion that the t-shirt came from the safe is a wholly-insufficient basis upon which to argue that defense counsel knew this and could in good faith make such an argument at trial, let alone that the failure to do so fell below acceptable professional standards.

apparently indicating the presence of two prints on items in the safe which, legible or not, obviously were not traced to Melendez (Tr. 76-84); further investigation into the presence of stray fingerprints of other people would have added little or nothing to the defense.

D.    Eliciting Damaging Testimony

Finally, Melendez suggests that trial counsel "gratuitously opened the door to the introduction of evidence that he was a member of a gang" and elicited other arguably negative testimony.  (D. Br. 19-20.)  None of these claims stands up to analysis.

(1) The jury already knew that Price had told the police and Grand Jury that some of Melendez's clothes were kept in Price's apartment (Tr. 132); defense counsel did not gratuitously elicit that information from Price, but rather sought to minimize it by having her explain that *she* had brought them there from her mother's house, where she and Melendez had lived together, and that Melendez did not even know the clothes were there.  (Tr. 147.)

(2) The jury also knew that Melendez was a convicted felon – a necessary element of one of the charges against him, and a proper limiting instruction on the use of that evidence was given, both at the time it was introduced and during the final charge to the jury.  (Tr. 217-18, 397-98.)  There was thus very limited sting to the additional fact that he had violated parole, a passing detail that came out when counsel was developing from Price the major break in her relations with Melendez.  (Tr. 147.)  It was perfectly reasonable strategy to pass over the matter quickly rather than to seek a limiting instruction that would have simply called further attention to the detail.

(3) Finally, the reference to gang activity was a passing comment unlikely to have prejudiced Melendez.  Since a government witness had alluded to his role in investigating gang

activity, counsel (using a tactic common in trials when police witnesses allude to dramatic or dangerous duties not related to the case at hand) asked the supervising detective in the case whether there was any indication that *Melendez* had anything to do with gangs – surely expecting a negative answer, since apparently nothing in the materials discovered by the Government in the case referred to any such connections. The witness responded, however, that "[t]here was a report that he was affiliated with the Bloods in some way." (Tr. 283.) Counsel then asked if the witness had the report with him, and was told that he did not, thus casting some doubt on the very existence of any such report.

It is certainly important for defense counsel to be fully familiar with the depths of their clients' depravity, including conduct not charged in the case. Accepting arguendo the truth both of Melendez's assertion that counsel had not asked him about membership in a gang and of his hypothetical assurance that if asked he would have told counsel that it would not be safe to ask the police about the subject (Melendez Decl. ¶ 3), it was incautious of counsel to ask a question to which he did not know the answer, without having confirmed with his client that the answer would be negative. Nevertheless, the question and answer consumed six lines in a transcript of over 400 pages, and the subject was never alluded to again by anyone. There is no reasonable possibility that the passing hearsay reference to a vague hearsay report could have influenced the jury's verdict.[10]

---

[10] Counsel would have perhaps been entitled to an instruction that the "report" of a possible "affiliat[ion] . . . in some way" was hearsay that was not to be considered for the truth of the matter asserted, and concerned an allegation irrelevant to the trial. Of course, any trial lawyer would recognize the folly of seeking an instruction to disregard an answer he himself had elicited, which could only have drawn further attention to a matter otherwise quickly forgotten, and given the impression that the defense was unduly concerned about the matter.

Singly or in combination, defendant's quibbles with his attorney's performance do not establish any shortfall in counsel's representation. There is no basis for granting a new trial.

IV.     Alleged Brady Violations

Finally, Melendez argues that he should be granted a new trial because the Government failed to disclose material favorable information in violation of the rule of Brady v. Maryland, 373 U.S. 83 (1963). "[A] Brady violation occurs only where the government suppresses evidence that 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001), quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995). "The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Evidence is not "suppressed," however, if "the defendant either knew, or should have known, of the essential facts permitting him to take advantage of" such evidence. United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993), quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982). Melendez's claim is lacking in merit on its face, since its very presentation reveals that the Government did disclose precisely the information he complains was suppressed.

Melendez identifies a number of purported Brady violations. First, he refers to the potentially exculpatory fingerprint evidence discussed above. But as defendant himself points out, this claim is based on "one of the documents disclosed during discovery," which "suggested that an identifiable fingerprint was recovered" from items found in the safe, "which did not match [the fingerprints] of defendant." (D. Br. 20.) Thus, by defendant's own account, the

Government provided him with the very discovery he claims he was denied, in time for him to make use of the information at trial.

Moreover, this information was not simply available for use; it was used, and used effectively, to make the very point Melendez now says timely disclosure would have permitted to be made. Melendez's brief makes no mention of the fact that trial counsel aggressively cross-examined a Government witness about the absence of defendant's fingerprints on the items from the safe, using the report in question to make the point. (Tr. 76-84.) Counsel also made much of the point in summation. (Tr. 342-46.) In particular, counsel inquired into the specific question of whether the prints found on the items mentioned in the report cited by Melendez were legible or not. (Tr. 84.) There is simply no basis for a claim that any exculpatory evidence was denied to the defense.[11]

Second, and even more peculiarly, Melendez claims that the Government denied him access to exculpatory statements made by Price. (D. Br. 21-23.) Of course, the fact that Price was a potential witness was known to Melendez from the beginning. Price is the mother of Melendez's child, and she testified that she spoke to Melendez dozens of times while he was in jail awaiting trial. (Tr. 138-41, 173-76.) The Government, moreover, specifically disclosed that the items on which the case was based were seized from Price's apartment, provided defendant with a copy of her written consent to search, and wrote to defense counsel at least twice, in July and August 2004, many months before the trial, advising that the defense should speak to Price. This in itself was sufficient to alert the defense that Price had potentially exculpatory

---

[11] To the extent that Melendez speculates that there may be additional evidence concerning the prints that was not disclosed (D. Br. 20-21), there is no basis for that assertion, and no basis for the Court to open an investigation into the issue now.

information, and it is clear from Melendez's own motion papers that in a letter in December 13, 2004, at least a week before trial, the Government specifically indicated that Price had exculpated Melendez on the day of the search. (D. Br. 21-22.) In fact, a December 16, 2004, letter from the Government specifically referred both to the exculpatory statements made by Price on the day of the search before her signed statement inculpating Price, and to statements made on May 7, 2004, before her inculpatory grand jury testimony. (G. Br. Ex. A.)[12] Price spoke to defense counsel about her testimony before the trial (Tr. 177-80), and of course, Price gave exculpatory testimony at trial. There is simply no basis for any claim that her potential as a defense witness, and the full history of her flip-flopping accounts of the facts, were not fully disclosed to the defense.[13]

Third, and relatedly, Melendez complains that the Government engaged in misconduct by coercing Price to testify falsely before the Grand Jury and hiding that fact from the defense. (D. Br. 25-27.) This is not a "fact" suppressed by the Government, however, but rather an accusation by Price that was always known to the defense and that has been denied by the officers involved. (Tr. 34, 101-02, 191-93.) The defense had full access to Price and was fully aware of her claims of coercion. The defense was thus in a position to make the jury aware of

---

[12] Perplexingly, this statement appears to be the specific statement Melendez complains he was unaware of. (D. Br. 22.)

[13] As noted above, the defense made a tactical decision not to highlight these prior statements, to avoid the risk that the child's inculpatory statement would become known to the jury in connection with Price's initial recantation of her exculpatory statements. The statements were, however, fully disclosed to the defense and available for use had such use been considered desirable.

Price's claims, and to confront the officers' contrary account of what occurred.[14] It chose not to do so – wisely, in this Court's estimation. Melendez may now believe that a different tactic might have been preferable. Nothing, however, was withheld or suppressed by the Government.

Finally, Melendez accuses the Government of eliciting perjured testimony from police officers who testified that they did not open the safe until after a warrant had been obtained, when in fact, according to Melendez, it had been opened shortly after it was seized. (D. Br. 23-25.) Once again, Melendez points to no newly-discovered evidence supporting this accusation. Rather, he relies primarily on his own purported observation of the open safe on the night of his arrest, before the warrant was issued. (Melendez Decl. ¶ 9.)[15] Melendez could have offered this account either as testimony at trial or in support of a suppression motion, but chose not to place his credibility in issue against that of the officers in either setting. Again, there are obvious tactical reasons for choosing not to make an issue of this alleged misconduct by the officers, including fear of the possibility of a sentence enhancement for obstruction of justice. See U.S.S.G. § 3C1.1.[16] In short, there is no basis for a finding that the Government relied on

_____

[14] Notably, Price has declined to repeat these accusations under oath in connection with the present motion. (Eisemann Decl. ¶ 17.)

[15] The argument that the involvement of a federal officer in the request for a search warrant and the opening of the safe on April 16 demonstrates that the police already knew a gun was in the safe is unpersuasive. Melendez was known to be a felon, and ammunition had been found in another closet in the apartment. (Tr. 35-37.) There was thus already a basis for federal prosecution even before the gun was discovered. A federal ammunition-possession prosecution was hardly a mere academic or theoretical possibility that can be assumed not to have been on the minds of the officers. Federal prosecutions for felon-in-possession based on ammunition are hardly unusual; the search warrant affidavit averts to the possibility of such a prosecution (Gov't Br. at 29, citing GX 3504-Q at ¶¶ 5, 8, 12); and the federal agent involved in the case specifically testified that he became involved in the case due to the discovery of ammunition (Tr. 230).

[16] Melendez also claims that the fact (known before trial) that the safe was not vouchered until April 16, three days after it was seized by police, somehow supports his claim. (D. Br. 25.)

perjured testimony, and no credible basis for the Court now to conduct a hearing or to investigate claims that could have been raised at trial or by pre-trial motion.

None of Melendez's claims of <u>Brady</u> violations or related claims of prosecutorial misconduct have merit.

## CONCLUSION

Melendez received a fair trial, and the jury found him guilty based on amply sufficient evidence. He has shown no basis for disturbing that verdict or granting him a new trial. Accordingly, his post-trial motion for a new trial and other relief is denied in its entirety. The defendant will be sentenced on Friday, August 11, 2006, at 3:00 p.m.

SO ORDERED.

Dated: New York, New York
      May 12, 2006

GERARD E. LYNCH
United States District Judge

---

However, this fact is either completely irrelevant to the issue of when the safe was *opened*, or it supports the Government's argument that the safe was opened when its witnesses said it was, that is, on April 16, the same day it was vouchered.